Filed 8/20/20  Petty v. The Corcoran Gallery of Art CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SUSANNE JILL PETTY, TRUSTEE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>THE CORCORAN GALLERY OF ART, et al.,<br><br>    Defendants and Appellants. | B293796<br><br>(Los Angeles County Super. Ct. No. 18STPB03226) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel Juarez, Judge.  Affirmed.

Sheppard, Mullin, Richter & Hampton LLP, James M. Burgess, Karin Dougan Vogel, and Julie A. Bauman for Plaintiff and Respondent.

Paul Hastings LLP, Valerie Marek, and Kamila LaBerge for Defendants and Appellants.

———————————————

## INTRODUCTION

The Corcoran Gallery of Art and the Trustees of the Corcoran Gallery of Art appeal from a judgment granting Susanne Jill Petty's petition requiring Corcoran to return artwork and a cash gift to the Alice C. Tyler Art Trust. Corcoran argues that, because it did not generally appear in this action, the probate court lacked jurisdiction and the judgment is void. Corcoran also asserts that the probate court erred in entering judgment because Petty failed to properly serve the petition; Petty untimely served its response to the probate court's notes; and the court failed to rule on Corcoran's motion for reconsideration. Corcoran also contends that a District of Columbia court order restricted its ability to comply with the probate court's judgment.

We conclude that the trial court properly entered judgment. By making a general appearance through a motion for reconsideration, Corcoran waived its objections to any defects in service or to lack of personal jurisdiction. Further, because Corcoran did not oppose the petition and only asserted its arguments in a defective motion for reconsideration, Corcoran forfeited those arguments. Even if Corcoran's arguments are considered, they lack merit. Therefore, we affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A. *Corcoran and the Tyler Trust*

#### 1. *Corcoran*

The Trustees of the Corcoran Gallery of Art is a nonprofit corporation that owns and operates the Corcoran Gallery of Art, a private art museum in the District of Columbia (collectively, Corcoran). In 1869, through a deed of trust, William Wilson

2

Corcoran established the Corcoran as "'an institution in Washington City, to be 'dedicated to Art,' and used solely for the purpose of encouraging the American Genius, in the production and preservation of works pertaining to the 'Fine Arts,' and kindred objects.'" Several years later Corcoran established Corcoran College of Art & Design, devoted to the teaching of art and design. Corcoran College was integrated into Corcoran, becoming an accredited school of art and design.

### 2. *Tyler Trust*

In October 1974 Alice C. Tyler, a resident of Los Angeles, established a revocable trust to hold certain of her assets. In April 1988, pursuant to California law, Tyler revoked and amended certain provisions of this trust, renaming it the Alice C. Tyler Art Trust. The trust held over 100 works by artist Suzanne Regan Pascal (the Pascal collection)[1] and provided that, upon Tyler's death, the Pascal collection shall be transferred to a museum for exhibition. The trust's terms provided that the museum would receive a cash gift "to assist with the cost of securing and otherwise maintaining the collection . . . ."

According to the terms of the trust, the museum would receive the Pascal collection subject to specified conditions regarding its display. The trust's terms further provided that, should the museum, in the trustees' "sole discretion," fail to comply with these conditions, the trustees may terminate the

---

[1] The Pascal collection contained glass sculptures, paintings, and other forms of art. Pascal's glass sculptures were described as unique because she was the only sculptor who carved glass using only a hammer and chisel, "bringing into form realistic sculptures."

3

museum's rights in "any property" received, and the museum shall return "forthwith" all property to the trust.

### 3. *Tyler Trust's Conditional Gift to Corcoran*

After Tyler's death in 1993, pursuant to the terms of the trust and a written agreement, the trust transferred the Pascal collection to Corcoran. Based on the Tyler trust's requirements, as conditions of receiving the Pascal collection, Corcoran agreed to establish a permanent gallery known as the "Alice and John Tyler Gallery," display part of the Pascal collection at least two months each year, and keep at least one work from the Pascal collection in the Alice and John Tyler Gallery "at times when guest or other collections are on display." Under the agreement, Corcoran received $1 million in cash "to assist with the cost of securing and otherwise maintaining" the Pascal collection in its permanent gallery at Corcoran.

As also required by the Tyler trust, the agreement further provided that "[t]he determination from time to time of whether any or all of the conditions herein set forth have been fulfilled shall be made by and within the sole discretion of the [Tyler trust] Trustees. [¶] In the event the [Tyler trust] Trustees shall determine that [Corcoran] has not complied with the conditions set forth in this Agreement, the [Tyler trust] Trustees may terminate all rights of [Corcoran] in the [Pascal collection]" and Corcoran "shall return to the [Tyler trust] Trustees forthwith" the Pascal collection and the $1 million cash gift. The agreement further provided, in the event of termination, "All expenses of packaging, shipping, insurance, delivery and other expenses related to returning the work of art shall be borne by [Corcoran]."

The agreement prohibited Corcoran from selling the Pascal collection, and Corcoran agreed that "all rights for copies or

4

derivative works remain with the artist and [Corcoran] agrees that nothing may be reproduced without the express permission of the artist." The agreement provided, "In the event of any suit or proceeding the prevailing party therein shall be entitled to recover its attorneys fees and other expenses." The agreement further stated that it "shall be governed by and construed in accordance with the laws of the State of California."

B. *Corcoran Effectively Dissolves As an Independent Entity*

1. *Corcoran's Transfer Agreement with the National Gallery of Art*

Corcoran honored the terms of the agreement with the Tyler trust for 20 years. After struggling financially for over a decade, Corcoran considered a potential acquisition by the National Gallery of Art, a quasi-governmental institution in the District of Columbia. Because of these financial difficulties, on May 15, 2014 Corcoran and the National Gallery executed an Art Accession and Custodial Transfer Agreement (transfer agreement).[2] Under the transfer agreement, Corcoran agreed to "transfer and deliver into the custody, care and possession" of the National Gallery the collection of "art works owned or controlled by the Corcoran." Corcoran's art works would "be held by [the National Gallery] for the benefit of Corcoran." Pursuant to the transfer agreement, the National Gallery had the right to decide which of Corcoran's artworks to accession[3] into its art collection.

A related side letter dated June 19, 2014 directed that, once

---

[2] The transfer agreement provided that "Corcoran will continue as a legal entity committed to its original mission."

[3] To "accession" means to formally make something part of one's collection.

the National Gallery determined which of Corcoran's artworks it would and would not accession, after discussion with the National Gallery, Corcoran will distribute works not accessioned to museums or other institutions within the District of Columbia. However, Corcoran retained the right, after consultation with the National Gallery, to designate "a non-DC institution [as] the most suitable candidate for a particular work" without the work "first [being] offered to DC institutions." The side letter further provided that, before any artwork was distributed to an institution located outside of the District of Columbia, "either the Office of the Attorney General shall state in writing that it does not object, . . . or the proposed deaccessioning or distribution shall be subject to a further cy pres proceeding in the District of Columbia Superior Court." Finally, the transfer agreement obligated Corcoran and the National Gallery to "agree on an appropriate policy and program for distribution of [art works not accessioned by National Gallery] to other art museums . . . , which shall include appropriate provision for any then-existing liabilities, commitments and obligations relating to, associated with or arising from" these art works.[4]

    2. *Corcoran's Discussions with Tyler Trust*

    In July 2014 Corcoran's interim director, Peggy Loar, informed Susanne Jill Petty, a Tyler trust trustee,[5] that

---

[4]    Concurrently with the execution of the transfer agreement, Corcoran entered into agreements with George Washington University pursuant to which the Corcoran agreed to transfer its building and Corcoran College to George Washington University.

[5]    Petty was a trustee of the Tyler trust when it contracted with Corcoran. At the time she filed the petition in this action,

6

"Corcoran is completing an agreement" with the National Gallery pursuant to which "[a]ll works owned or controlled by the Corcoran will go to [the National Gallery]." After stating that Corcoran "has honored the terms" of the Pascal agreement, Loar further advised that the Pascal collection "while controlled by the Corcoran [was] never accessioned and this provides some flexibility in how the works are now treated." Loar also told Petty that the National Gallery would not be accessioning the Pascal collection. Loar requested that Petty advise Corcoran whether "there are any museums or venues you are aware of that would be interested in the [Pascal collection]." Loar further stated that Corcoran would "only transfer the works if the receiving party agrees to any current or modified conditions. . . . If we cannot find any venue that will accept the current or modified conditions, then we would propose the most appropriate step would be to return the works to the family." Corcoran offered to "pack and ship [the Pascal collection] at [its] expense."

3. *The District of Columbia Cy Pres Proceeding*

On June 17, 2014 Corcoran filed a cy pres proceeding in the District of Columbia Superior Court to obtain approval of its proposed transaction with National Gallery and George Washington University's proposal to acquire Corcoran College and Corcoran's building. Corcoran did not give the Tyler trust notice of the cy pres proceeding, and the Tyler trust did not participate in the proceeding. The District of Columbia court summarized the issues to be adjudicated: "1) [has Corcoran] established that it is impracticable to carry out the Deed of Trust

Petty was the Tyler trust's sole remaining trustee. Petty is Pascal's daughter.

that created the Corcoran given the Corcoran's current financial condition; and 2) if so, is the plan proposed by the Trustees as near as possible to the intent of William Wilson Corcoran when he established the Trust."

On August 18, 2014,[6] finding "it painful to issue an Order that effectively dissolves the Corcoran as an independent entity," the District of Columbia court ruled, "this Court believes that approval of [Corcoran's] proposal is necessary, given the Corcoran's financial circumstances, and further believes that the proposal properly effectuates Mr. Corcoran's original intent" in establishing Corcoran.[7] Because it was "impracticable to carry out the [Corcoran's] existing Deed of Trust," the court, under the cy pres doctrine, approved Corcoran's entry into the various agreements with the National Gallery, including the transfer agreement and the side letter.[8] The court's order provided that "the Corcoran Deed of Trust and any other applicable instrument is deemed to be revised to the extent necessary to permit

---

[6]  The District of Columbia court issued a 49 page "memorandum opinion" and a four page "order."

[7]  The District of Columbia Code provides, "if a particular charitable purpose is or becomes . . . impracticable . . . (3) The court may apply cy pres to modify or terminate the trust by directing that the trust property be applied or distributed, in whole or in part, in a manner consistent with the settlor's charitable purposes."  (D.C. Code, § 19-1304.13.)

[8]  The August 18, 2014 order also approved the agreements necessary to transfer Corcoran College and the Corcoran's building to George Washington University and permit the college's continued operation as a part of George Washington University.

[Corcoran] to perform and implement" the transfer agreement and related agreements "according to their terms." The order further stated, "The National Gallery of Art shall take and hold the Corcoran's collection of art, in the manner and for the purposes described in the [transfer agreement], and shall adhere to the restrictions as otherwise applicable to the collection, as those restrictions have been understood and implemented previously by [Corcoran]."**9**

### 4. *Tyler Trust's Termination of the Pascal Agreement*

On October 16, 2014 the Tyler trust notified Corcoran that, due to Corcoran's noncompliance with the Pascal agreement's conditions, the "Trustees wish to terminate all the rights of [Corcoran] in the [Pascal collection]." The Tyler trust demanded the return of both the Pascal collection and the $1 million cash gift. After receipt of this termination notice, Corcoran did not contest it failed to comply with the Pascal agreement or the Tyler trust's right to terminate the Pascal agreement.

### 5. *Corcoran's Retention of the Conditional Gift*

The Tyler trust had identified two institutions outside the District of Columbia that wished to display all or part of the Pascal collection. Declining to comply with the Tyler trust's request to transfer the Pascal collection, on January 30, 2015

---

**9** In its August 18, 2014 decision, when summarizing the National Gallery and George Washington University proposals, the court noted that, "'[a]s part of the transfers of art to the [National Gallery] and the College . . . to [George Washington University], any existing donor restrictions that are applicable to the particular assets' will remain in place and be fulfilled by [the National Gallery] or [George Washington University]."

Corcoran advised Petty that the District of Columbia order "modified any restrictions on works donated to the Corcoran to the extent necessary to permit the consummation of the [National Gallery] and [George Washington University] transactions by providing, in relevant part, that 'any other applicable instrument is deemed to be revised to the extent necessary to permit [Corcoran] to perform and implement the Agreements according to their terms.'" Corcoran further stated that the National Gallery "is considering whether it will accession any of the [Pascal collection] into their collection" and that art works that the National Gallery "determines not to accession will be considered for distribution to other qualified institutions." Corcoran also stated, "works not accessioned by the [National Gallery] must stay in DC unless we get the permission of the District's Attorney General or the court to send the work to a location outside of the District."

Corcoran retained the Tyler trust's cash gift, and the National Gallery holds the Pascal collection in storage.

C. *California Probate Proceedings*

  1. *Petty's Petition*

On April 5, 2018 Petty filed a petition in Los Angeles Superior Court seeking an order directing Corcoran to return the Tyler trust assets under Probate Code section 850 and confirming the existence of the Tyler trust under Probate Code section 17200, subdivision (a).[10] Because the Pascal collection was

---

**10**     Probate Code section 850, subdivision (a)(3)(B), provides a trustee "may file a petition requesting that the court make an order . . . [w]here the trustee has a claim to real or personal property, title to or possession of which is held by another."

"hidden away" in storage, which violated the express terms of the "conditional gift," Petty sought "an order of this Court requiring conditional gift beneficiary, the Corcoran, to return the [Pascal collection] and its associated $1 million cash gift, to [Petty] as Trustee of the Trust."

## 2. *Initial Hearing on the Petition*

The probate court held a hearing on the petition on June 14, 2018. At this hearing counsel for Corcoran appeared without making a jurisdictional objection. Because the probate notes highlighted that Petty had not served the petition and notice of hearing in compliance with Probate Code section 851, Petty requested a continuance to properly serve the documents. The court set another hearing for July 30, 2018. Counsel for Corcoran did not object to the continued hearing date, but indicated that Corcoran intended to file written objections. The probate court confirmed Corcoran could file written objections in advance of the continued hearing.

On July 23, 2018 Petty filed a further proof of service in connection with the July 30 hearing. On July 26, 2018 Corcoran's counsel emailed a letter to Petty's counsel contesting Petty's service of the petition and notice of hearing on Corcoran. Corcoran's counsel stated Petty's "purported proof of service cannot cure [Petty's] underlying failure to satisfy the notice requirements prior to the July 30, 2018 hearing."

Section 17200, subdivision (a), provides "a trustee or beneficiary of a trust may petition the court under this chapter concerning the internal affairs of the trust or to determine the existence of the trust."

11

### 3. *The Probate Court Posts Updated Notes*

Stating the notes were last changed on the afternoon of July 25, 2018, the court posted on its website updated probate notes. The probate notes contained a section entitled, "Matters to Clear," which included "new [notes] after further review" regarding Petty's service of the petition and the proof of service filed on July 23, 2018. The notes also stated that a description of the property and a right to answer legend were not included in the notice of hearing.

On Friday, July 27, 2018 at 4:12 p.m. Petty filed a supplement to the petition addressing the probate notes. The supplement responded to each issue in the probate notes detailing Petty's efforts to serve Corcoran with the petition and notice of hearing and attaching amended proofs of service and related documents. Petty also pointed out that, at the June 14, 2018 hearing, the probate court allowed her to serve an amended notice of hearing, which Petty accomplished. According to Petty, she served the amended notice of hearing on June 22, 2018 containing the required description of the property and right to answer legend.

### 4. *July 30, 2018 Hearing*

Corcoran did not file any objections or appear at the July 30, 2018 hearing. After reviewing the supplement and hearing from Petty's counsel, the probate court found that notice was proper and that Petty cleared the probate notes. At the hearing the probate court ruled, "With no appearance by [Corcoran], and I'm finding that notice is proper, and I'm clearing the notes in total on this matter. The court is going to grant the petition as requested."

12

Petty's counsel notified Corcoran's counsel of the probate court's order that same day. On August 8, 2018 Petty served and lodged a proposed judgment. Corcoran did not file objections to the proposed judgment.

### 5. *Corcoran's Motion for Reconsideration*

Two weeks later, on August 13, 2018 Corcoran filed a motion for reconsideration seeking to "modify, amend, or revoke" the probate court's July 30, 2018 order. Corcoran set the hearing for September 14, 2018. Corcoran did not apprise the probate court of the motion. Although it did not file a motion to quash service of the petition, Corcoran argued the probate court's order violated Corcoran's due process rights "because [Corcoran] was not served with process . . . and never submitted to this Court's jurisdiction." Corcoran also argued that Petty had failed to timely serve Corcoran with her comments to the probate notes before the July 30, 2018 hearing. Moreover, Corcoran asserted the probate court's order imposed obligations on Corcoran that conflicted with the District of Columbia order because that order "prohibits" removal of the Pascal collection from the District of Columbia "absent the express authorization of the Attorney General of the District of Columbia . . . or an order from the District of Columbia Superior Court."

Corcoran also stated it relied on representations that the Tyler trust was no longer in existence and requested discovery "relating to the trust's existence." Finally, Corcoran asserted that it had "other good defenses to the allegations of the Petition" and "[was] entitled to a fair opportunity to present those defenses." David Julyan, Corcoran's general counsel, filed a declaration addressing the substantive terms of the Pascal agreement, the transfer agreement with the National Gallery,

13

and the District of Columbia cy pres proceeding. Julyan stated, "on information and belief, [the $1 million gift was] exhausted over the period since 1994 . . . ." Julyan attached to his declaration the District of Columbia decision and order, Corcoran's transfer agreement with the National Gallery, and Corcoran's correspondence with the Tyler trust.

### 6. *Judgment on the Petition*

On August 15, 2018 the probate court, apparently unaware of the motion for reconsideration, entered judgment on the petition.[11] The judgment confirmed the existence of the Tyler trust, ordered Corcoran to return the Pascal collection and its accompanying cash gift to Petty in her capacity as trustee of the Tyler trust. The judgment also provided that "[Corcoran] shall pay [Petty's] attorneys' fees and costs." The judgement also stated, "Notice of the hearing on the petition has been given as required by law." Petty served notice of entry of judgment on August 17, 2018.

### 7. *Corcoran's Further Support of Reconsideration*

On August 31, 2018 Petty opposed Corcoran's reconsideration motion, arguing that the probate court lacked jurisdiction to hear the motion because "an appealable judgment has been entered." Petty also argued that Corcoran had waived any jurisdictional challenge by generally appearing at the June 14, 2018 hearing, and that the Pascal collection was not subject to the District of Columbia order. In its reply memorandum Corcoran argued the court erred by entering judgment while

---

[11] The probate court entered judgment against the Trustees of the Corcoran Gallery of Art and the Corcoran Gallery of Art.

14

Corcoran's motion for reconsideration was pending. Corcoran argued, "had the Court properly considered the merits of that Motion, the Corcoran believes the Court would have found that it was not appropriate to sign the Judgment."

The probate court did not rule on Corcoran's motion for reconsideration.[12]

Corcoran timely appealed.

## DISCUSSION

### A. *Standards of Review*

Whether a judgment is void due to improper service or lack of jurisdiction is a question of law that we review de novo. (*Sakaguchi v. Sakaguchi* (2009) 173 Cal.App.4th 852, 858; *Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 568.) "'When the facts giving rise to jurisdiction are conflicting, the trial court's factual determinations are reviewed for substantial evidence. [Citation.] Even then, we review independently the trial court's conclusions as to the legal significance of the facts.'" (*Ibid.*) We likewise review de novo the meaning and intent of an unambiguous written agreement. (*Gray v. McCormick* (2008) 167 Cal.App.4th 1019, 1024.)

"It is the appellant's burden to demonstrate the existence of reversible error." (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 766.) When a matter is left to the court's

---

**12** The probate court later explained its failure to rule on the motion for reconsideration before entering judgment, "Frankly at that moment since the court doesn't retroactively or prospectively look into the calendar for other matters, frankly I didn't even see your motion for reconsideration that was there at that point. You had filed it, I saw, but it was not on the court's radar."

15

discretion, we review the court's exercise of that discretion under the abuse of discretion standard and will not reverse if the court's decision "falls within the permissible range of options set by the applicable legal criteria." (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957.)

We will affirm a correct judgment even if the trial court's reasoning was faulty. "'If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.'" (*City of National City v. Wiener* (1992) 3 Cal.4th 832, 850.)

B. *The Probate Court Did Not Err in Granting the Petition on July 30, 2018*

1. *Corcoran Did Not Oppose Petty's Petition*

At the June 14, 2018 initial hearing Corcoran's counsel confirmed its ability and intention to file objections to the petition before the continued hearing on July 30. After failing to file objections, Corcoran did not appear at the July 30 hearing. At the July 30 hearing, after reviewing Petty's response addressing the probate notes, and, finding no objections to the petition, the probate court cleared the probate notes and granted Petty's petition.[13] In its motion for reconsideration, Corcoran did not contest that Petty lawfully terminated the Pascal agreement because of Corcoran's breach of that agreement. Corcoran

---

[13] At a subsequent hearing the probate court explained that, at the July 30 hearing, "I don't know that I had any other option but to grant the petition at that point. There was no reason not to at that point. I assumed very much so that any objections were waived to the petition, at least were not being brought forth to the court."

16

forfeited its ability to argue that Petty's petition lacked merit because Corcoran never made that argument in the probate court. (See *Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 ["'[f]ailure to raise specific challenges in the trial court forfeits the claim on appeal'"]; *Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406 ["'[a]s a general rule, failure to raise a point in the trial court constitutes [a] waiver and appellant is estopped to raise that objection on appeal'"]; *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 [same].)

Here, other than asserting that the District of Columbia order revised the Pascal agreement, which prevents Corcoran from returning the Pascal collection to Petty in California, Corcoran does not contest the enforceability of the termination provisions in the Pascal agreement. Corcoran also forfeited its right to contest the petition's merits by failing to raise arguments in its brief on appeal. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 (issue not raised on appeal "may therefore be deemed waived"]; *Cox v. Bonni* (2018) 30 Cal.App.5th 287, 311 [plaintiff forfeited arguments not addressed in her opening brief]; *Sierra Palms Homeowners Assn. v. Metro Gold Line Foothill Extension Construction Authority* (2018) 19 Cal.App.5th 1127, 1136 [appellant forfeited challenge to issue not raised on appeal].)

### 2. *The Probate Court Properly Enforced the Conditions Subsequent in the Pascal Agreement*

Even if Corcoran had not forfeited its arguments regarding the petition's merits, the probate court did not err in enforcing the Pascal agreement's termination provisions. As set forth in the petition, Corcoran accepted the Pascal collection subject to

17

the conditions set forth in the Pascal agreement.  Although Corcoran adhered to the Pascal agreement's terms for 20 years, there is no dispute that Corcoran breached those conditions when it stopped displaying the Pascal collection.  Petty then exercised its right to terminate the agreement.

The Pascal agreement provided the Tyler trust, based on a "determination" made in its "sole discretion," "may terminate all rights of [Corcoran] in the works of art," and that "upon termination of [Corcoran's] rights, [Corcoran] shall return to the Trustees forthwith all of the works of art . . . together with the cash gift . . . ."  These conditions, given this specific language in the Pascal agreement, were enforceable under California law as a gift made subject to a condition subsequent.  In *L.B. Research & Education Foundation v. UCLA Foundation* (2005) 130 Cal.App.4th 171, the court held that, "if the donor clearly manifests an intention to make a conditional gift, that intention will be honored.  [Citation.]  The gift will be construed as one of a fee simple subject to a condition subsequent if ' . . . it is expressly provided in the instrument that the transferee shall forfeit it or that the transferor or his heir or a third person may enter for breach of the condition.'"  (*Id.* at p. 178; accord, *City of Palm Springs v. Living Desert Reserve* (1999) 70 Cal.App.4th 613, 621 ["the owner of property may transfer it to another on the condition that if the latter should fail to perform a specified act the transferee's interest shall be forfeited either to the transferor or to a designated third party"]; see *Walton v. City of Red Bluff* (1991) 2 Cal.App.4th 117, 125 ["The owner of property may transfer it, inter vivos or by will, to another person and provide that if the latter should fail to perform a specified act his interest

should be forfeited. In such a case the interest of the transferee is subject to a condition subsequent and is not held in trust"].)

Accordingly, the probate court did not err in enforcing the conditions subsequent in the Pascal agreement. (*Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 68-69 ["'[i]f contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs'"]; *Marzec v. Public Employees' Retirement System* (2015) 236 Cal.App.4th 889, 910 ["'[w]hen the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement'"]; see Civ. Code, § 1638 ["language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"].)

C. *The Probate Court Did Not Err in Entering Judgment on August 15, 2018, Even Though Corcoran Had Filed a Motion for Reconsideration*

Two weeks after the probate court granted the petition, Corcoran filed a motion for reconsideration of the court's order. However, although Petty had submitted a proposed judgment, Corcoran did not advise the probate court of the motion, even though it was set for hearing on September 14, 2018. The probate court, not knowing Corcoran's motion was filed, entered judgment without ruling on the motion.

Once a court enters judgment, it loses jurisdiction to rule on a motion for reconsideration. (See *APRI Ins. Co. v. Superior Court* (1999) 76 Cal.App.4th 176, 180 (*APRI*) ["we conclude that the trial court may not grant reconsideration after judgment has been entered]; *Magallanes v. Superior Court* (1985) 167 Cal.App.3d 878, 882 ["[t]he trial court had power to reconsider the ruling so long as no final judgment had been entered and the

19

case was still pending before the court"]; see also *Kasper v. Cedars-Sinai Medical Ctr.* (1998) 62 Cal.App.4th 780, 782 ["the trial court's entry of judgment . . . operated as an implied denial of the pending reconsideration motion"]; *Ramon v. Aerospace Corp.* (1996) 50 Cal.App.4th 1233, 1237 ["[a] final judgment terminates the litigation between the parties and leaves nothing in the nature of judicial action to be done other than questions of enforcement or compliance"].)  "The issue is jurisdictional.  Once the trial court has entered judgment, it is without power to grant reconsideration.  The fact that a motion for reconsideration may have been pending when judgment was entered does not restore this power to the trial court." (*APRI,* at p. 182.)

Corcoran argues the probate court committed "error" by entering judgment on Petty's petition "without addressing" its pending motion for reconsideration.  In support, Corcoran relies on the court's comment in *APRI* that the "court should have considered the merits of the motion for reconsideration."  In the next sentence, however, the court in *APRI* held, "But, once the trial court entered judgment, it could not reconsider the ruling on the motion to quash." (*APRI, supra,* 76 Cal.App.4th at p. 182.)

Although Petty served Corcoran with a proposed judgment, Corcoran did not object to the proposed judgment or apprise the probate court of the motion for reconsideration.  Because the probate court entered the judgment that Petty submitted, as the court in *APRI* held, the probate court was without jurisdiction to adjudicate the motion for reconsideration.  (*Betz v. Pankow* (1993) 16 Cal.App.4th 931, 937.)  Corcoran has not cited any authority to support its contention that the probate court's entry of judgment prior to ruling on Corcoran's motion requires reversal of the judgment.

20

D. *Any Error in Entering Judgment While Corcoran's Motion for Reconsideration Was Pending Was Harmless*

Even if the probate court erred in entering judgment while the motion for reconsideration was pending, any error was harmless because the motion was not a proper motion for reconsideration and, in any event, lacked merit.

1. *Corcoran's Motion for Reconsideration Was Improper Under Code of Civil Procedure Section 1008*

Code of Civil Procedure section 1008, subdivision (a), provides that, within 10 days after service of a written notice of entry of an order, a party may make a motion to reconsider the order "based upon new or different facts, circumstances, or law." "The moving party also must provide a satisfactory explanation for the failure to make the showing at or before the time the challenged order was issued." (*New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 208.) Section 1008, subdivision (e), further provides, "No application to reconsider any order or for the renewal of a previous motion may be considered by any judge or court unless made according to this section." Under section Code of Civil Procedure 1008, subdivision (e), the trial court generally has no jurisdiction to hear a motion for reconsideration that does not comply with the requirements of the section. (*Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1278; *Kerns v. CSE Ins. Group* (2003) 106 Cal.App.4th 368, 391.)

Corcoran's motion for reconsideration failed to set forth in an affidavit (or otherwise) "what new or different facts, circumstances or law are claimed to be shown." In its reconsideration motion, Corcoran set forth grounds for relief based on information available before the July 30, 2018 hearing. Under these circumstances, Corcoran's motion was defective as a

21

matter of law. (See *Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 839 ["[c]ourts have construed section 1008 to require a party filing an application for reconsideration or a renewed application to show diligence with a satisfactory explanation for not having presented the new or different information earlier"]; *Hennigan v. White* (2011) 199 Cal.App.4th 395, 406 ["trial court correctly denied Hennigan's motion for reconsideration to admit her doctor's supplemental declarations and her own declaration, as the testimony did not constitute 'new or different facts' for purposes of granting reconsideration"].)

Thus, any error in not hearing the motion for reconsideration was harmless because the motion could not have been properly granted. Corcoran cannot demonstrate prejudice. (*In re Marriage of Goddard* (2004) 33 Cal.4th 49, 57 ["the presumption in the California Constitution is that . . . any error as to any matter of procedure,' is subject to harmless error analysis and must have resulted in a 'miscarriage of justice' in order for the judgment to be set aside. (Cal. Const., art. VI, § 13.)"]; *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 884 ["[p]rocedural defects which do not affect the substantial rights of the parties do not constitute reversible error"]; see also Code Civ. Proc., § 475 ["[t]he court must, in every stage of an action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the opinion of the court, does not affect the substantial rights of the parties"].)

E. *Corcoran's Motion for Reconsideration Also Lacked Merit*

Arguing the same grounds it asserted in its defective motion for reconsideration, Corcoran contends that the probate

22

court erred in granting the petition because the court lacked jurisdiction over Corcoran, Petty did not timely serve its response to the court's probate notes, and the District of Columbia order revised the Pascal agreement, restricting Corcoran's ability to return the Pascal collection to California. Even if Corcoran's motion for reconsideration had been legitimate and these issues were reviewable, each ground asserted lacks merit.

1. *Rather than Properly Contesting Jurisdiction, Corcoran's Motion for Reconsideration Constituted a General Appearance*

Because Corcoran's motion for reconsideration sought substantive merits relief, Corcoran waived its objections to personal jurisdiction and any alleged service defects, and Corcoran submitted to the probate court's jurisdiction.

a. *Applicable law*

"[D]efective service is not fatal to personal jurisdiction if the defendant consents to jurisdiction over him or her by making a general appearance in the action." (*In re Vanessa Q.* (2010) 187 Cal.App.4th 128, 135.) "A general appearance by a party is equivalent to personal service of summons on such party." (Code Civ. Proc., § 410.50, subd. (a).) "'A general appearance operates as a consent to jurisdiction of the person, dispensing with the requirement of service of process, and curing defects in service.'" (*Fireman's Fund Ins. Co. v. Sparks Construction, Inc.* (2004) 114 Cal.App.4th 1135, 1145; accord, *In re Jennifer O.* ( 2010) 184 Cal.App.4th 539, 548 [a "general appearance by a party is equivalent to personal service of summons on such party"]; *Titus v. Superior Court* (1972) 23 Cal.App.3d 792, 800-801 (*Titus*) [a general appearance "operates as a consent to jurisdiction"].)

23

"A general appearance occurs when the defendant takes part in the action or in some manner recognizes the authority of the court to proceed.  [Citations.]  If the defendant confines its participation in the action to objecting to lack of jurisdiction over the person, there is no general appearance." (*Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 52 (*Dial 800*); accord, *Hamilton v. Asbestos Corp.* (2000) 22 Cal.4th 1127, 1147).)  "A party whose participation in an action is limited to challenging the court's personal jurisdiction does not make a general appearance.  Other forms of participation, however, such as seeking affirmative relief or opposing a motion on the merits, ordinarily constitute a general appearance." (*Serrano v. Stefan Merli Plastering Co., Inc.* (2008) 162 Cal.App.4th 1014, 1028); accord, *Titus*, *supra*, 23 Cal.App.3d at pp. 800-801 [an appearance solely to contest jurisdiction is a special appearance, through which defendant "does not thereby consent to jurisdiction over his person"].)

"A California defendant can preserve objections to personal jurisdiction only by making a special appearance, i.e., an appearance for the sole purpose of objecting to the court's jurisdiction." (*In re Marriage of Obrecht* (2016) 245 Cal.App.4th 1, 8.)  However, a party who "'raises any other question, or asks for any relief which can only be granted upon the hypothesis that the court has jurisdiction of his person." (*Cal. Overseas Bank v. French Am. Banking Corp.* (1984) 154 Cal.App.3d 179, 184) will be deemed to have "made a general appearance and waived all objections to defects in service, process, or personal jurisdiction." (*Dial 800*, *supra*, 118 Cal.App.4th at p. 52 [filing an attorney's fees request constituted a general appearance, waiving appellants' jurisdictional challenges]; *City of Riverside v.*

*Horspool* (2014) 223 Cal.App.4th 670, 679-680 [request for continuance constituted general appearance]; accord, *Mansour v. Superior Court* (1995) 38 Cal.App.4th 1750, 1756-1757 [defendants' active participation in preparation of joint case management statement and in an evaluation conference constituted general appearance]; *Estate of Pailhe* (1952) 114 Cal.App.2d 658, 661 [attorney's appearance and participation in a hearing on the merits constituted party's general appearance; "the attorney's act in appearing for [party] carried with it a presumption of due authority upon his part to do so"].)

"""Whether an appearance is general or special is determined by the character of the relief sought and not by the intention of the party that it shall or shall not operate as a general or special appearance. The statement of a defendant or party that he is making a special appearance is not necessarily conclusive. . . ."""" (*Slaybaugh v. Superior Court* (1977) 70 Cal.App.3d 216, 221-222.)

> b. *Corcoran forfeited all objections based on lack of personal jurisdiction and improper service by making a general appearance*

Corcoran's appearance at the June 14, 2018 hearing may have constituted a general appearance because Corcoran's counsel did not state Corcoran was objecting to service of the petition or the court's jurisdiction.[14] (See *City of Riverside v.*

---

[14] At the June 14, 2018 hearing Corcoran's counsel stated: "Good morning, Your Honor. Valerie Marek here on behalf of respondents, the Corcoran Gallery of Art and the Board of Trustees for the Corcoran Gallery of Art. . . . Respondents don't object to that timeline as we, too, would prefer to file a written objection. . . . Yes, we would like to file our written objections by

*Horspool, supra,* 223 Cal.App.4th at p. 679 ["[a] general appearance occurs when a defendant takes part in the action or in some manner recognizes the authority of the court to proceed"]; *In re Vanessa Q., supra,* 187 Cal.App.4th at p. 135 [counsel's request for continuance constituted general appearance]; *Mansour v. Superior Court, supra,* 38 Cal.App.4th at p. 1757 ["[a]n attorney's appearance for a party at a hearing can also result in a general appearance"].)

However, there is no question that Corcoran generally appeared by filing its motion for reconsideration because the motion was not limited to challenging jurisdictional or service issues.[15] In addition to challenging service and personal jurisdiction, Corcoran's motion for reconsideration requested that the probate court "modify, amend, or revoke" its July 30, 2018 order because: (1) Petty failed to timely serve comments to the court's probate notes; (2) the District of Columbia order restricted the Pascal collection's removal from the District of Columbia; (3) the Tyler trust may no longer exist and discovery was required; and (4) Corcoran possessed "other good defenses to the allegations of the Petition" and requested a "fair opportunity to present those defenses." Julyan's declaration submitted evidence supporting Corcoran's merits-related requests for relief.

that time." Corcoran's counsel also inquired, "And did Your Honor have any preferences to the date with which we should file our objections by?"

[15] On April 28, 2020, in response to this court's order, the parties submitted further briefing regarding: "did [Corcoran] generally appear in the action through their August 13, 2020 Motion for Reconsideration of the Court's July 30, 2018 Order?"

26

Corcoran challenged the substance underlying the July 30, 2018 order and the merits of the petition.  For example, questioning the existence of the Tyler trust, Corcoran sought "discovery relating to tax filings, meetings since 1994, and other documents . . . ."  Corcoran also urged the probate court to "deny" Petty's petition because Corcoran cannot "remove the [Pascal collection] from the District . . . without running afoul [the District of Columbia order]."  As discussed, Corcoran also contended the probate court issued the July 30, 2018 order in violation of the court's local rules because "[c]ounsel for [Petty] failed timely to serve on [Corcoran] his comments to the [probate court's] identified probate notes."

By affirmatively seeking relief, introducing supporting evidence, and arguing the merits, Corcoran participated in this action and recognized the probate court's jurisdiction.  Corcoran sought "relief available only if the court has jurisdiction over [it]." (*Factor Health Management v. Superior Court* (2005) 132 Cal.App.4th 246, 250.)  Corcoran therefore submitted to the probate court's jurisdiction and generally appeared.  (*Serrano v. Stefan Merli Plastering Co., Inc., supra,* 162 Cal.App.4th at p. 1029 ["seeking affirmative relief or opposing a motion on the merits, ordinarily constitute a general appearance . . . and became subject to the court's personal jurisdiction"]; *People v. Ciancio* (2003) 109 Cal.App.4th 175, 192 ["DMH filed a response to the OSC in which it argued the merits of the motions, challenged the relief sought by the alleged SVP's, and expressly requested that the motions be denied on their merits"]; *Kallman v. Henderson* (1965) 234 Cal.App.2d 91, 99 ["[t]he general appearance was made by Mr. Henderson when he filed the present motion, based not only on his contention that there had

27

been no personal appearance by him but also on the subject matter of the complaint and the existence of alleged fraud"].)

Given its general appearance, Corcoran "relinquish[ed] all objections based on lack of personal jurisdiction or defective process or service of process." (*In re Marriage of Obrecht, supra,* 245 Cal.App.4th at p. 7.) Further, because Corcoran failed to make a motion to quash before it generally appeared, "none of the issues relating to notice or due process were preserved for review by a timely motion to quash *prior* to making a general appearance." (*City of Riverside v Horspool, supra,* 223 Cal.App.4th at pp. 680-681 ["William's failure to make a proper challenge to jurisdiction in the trial court (as by a motion to quash service prior to any general appearance) forfeits any such challenge on appeal"].)[16]

---

[16] Corcoran did not argue in the trial court and it does not argue in its briefing that a general appearance operated as consent to jurisdiction only for subsequent proceedings. Corcoran therefore doubly forfeited this argument. (See *Children's Hospital and Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 776 [party "'doubly waived'" an argument by failing to make the argument in the trial court and also failing to raise the argument in its briefing on appeal]; *Sweetwater Union High School Dist. v. Julian Union Elementary School Dist.* (2019) 36 Cal.App.5th 970, 987 [arguments not raised in opening brief are forfeited]; *Quiles v. Parent, supra,* 28 Cal.App.5th at p. 1013 ["[f]ailure to raise specific challenges in the trial court forfeits the claim on appeal"].) At oral argument Corcoran asserted, based on *In re Marriage of Smith* (1982) 135 Cal.App.3d 543, that the effect of any general appearance would operate only prospectively. However, *In re Marriage of Smith* is distinguishable because it concerned a "general appearance after judgment was entered." (*Id.* at p. 545.) (See *In re Marriage of Obrecht, supra,* 245

28

Citing *Josephson v. Superior Court of Los Angeles County* (1963) 219 Cal.App.2d 354 (*Josephson*) and *Varra v. Superior Court of Humboldt County* (1960) 181 Cal.App.2d 12 (*Varra*), Corcoran argues that the motion for reconsideration, following its counsel's "specific appearance" at the June 14, 2018 hearing "for the sole purpose of opposing Petty's ineffective service," was not a general appearance. Corcoran contends its motion merely renewed the "ineffective service" objections made at the June 14, 2018 hearing. However, as stated, Corcoran's counsel did not object to service at the June 14 hearing, and Corcoran's motion for reconsideration went beyond jurisdictional issues by seeking to vacate the July 30, 2018 order on grounds other than jurisdiction. Moreover, neither *Josephson* nor *Varra* supports Corcoran. The courts in these cases affirmed the settled principle that a motion for reconsideration following, and restricted to, the same limited jurisdictional grounds as a motion to quash, did not confer jurisdiction by converting a movant's prior special appearance into a general one. In doing so, the courts pointed out that where, as here, if the party moving for reconsideration asks for any relief other than lack of jurisdiction, the party will be deemed to have made a general appearance. (*Josephson*, at p. 361; *Varra,* at p. 14.)

_____

Cal.App.4th at p. 11 [holding that *In re Marriage of Smith* was "inapposite" for "at least two reasons: the claim here is not defective service, but want of a constitutional basis of jurisdiction, and [the defendant's] general appearance was not made after judgment, but much earlier in the action, at a time when [defendant] could have moved to quash, but instead appeared on the merits"].)

In *Josephson* petitioner filed a timely notice of motion to quash service of summons for lack of jurisdiction. (*Josephson, supra*, 219 Cal.App.2d at p. 356.) When the trial court denied petitioner's motion, petitioner moved for reconsideration of the motion to quash on the same limited grounds; that the court lacked personal jurisdiction over petitioner, and petitioner sought "'only to quash service of summons upon him.' He sought no other or further relief." (*Id*. at p. 362.) Likewise, in *Varra*, rejecting "the contention that petitioner's motion to reconsider the denial of her motion to quash constituted a general appearance, the court held that "[p]etitioner sought in her first motion to have service of summons quashed for lack of jurisdiction of her person and in her second motion [for reconsideration] sought the same relief and nothing more." (*Varra, supra*, 181 Cal.App.2d at p. 14.)

> 2. *The Probate Court Did Not Abuse Its Discretion by Granting the Petition Despite Petty Filing Its Supplement One Day Late*

Corcoran's defective motion for reconsideration also argued that Petty served its response to the court's probate notes one day late in violation of the court's local rules. That argument, even if properly raised, was also meritless.

On the afternoon of July 25 the probate court posted updated notes in connection with the July 30 hearing.[17] Los Angeles Superior Court Local Rule 4.4, subdivision (b), required

---

[17] Los Angeles Superior Court Local Rule 4.4, subdivision (a), provides that probate notes "are available in advance of a hearing" on the court's website. The record does not disclose when the probate court first posted notes for this hearing, or if the updated notes were the only notes posted for this hearing.

30

Petty's counsel to "clear" the probate notes "no later than 3:30 p.m. of the second court day preceding the hearing date." Given the July 30 (Monday) hearing date, Petty's deadline was 3:30 p.m. on July 26, 2018 (Thursday). Petty filed her response to the notes on July 27, 2018 (Friday) at 4:12 p.m., one day late. Petty's counsel emailed the "supplement" to Corcoran's counsel at 5:07 p.m. the same day.[18]

Corcoran argues Los Angeles Superior Court Local Rule 4.4, subdivision (c), required the probate court, given Petty's one day delay in filing its response, to "continue the hearing, place the matter off calendar, deny the matter without prejudice, or take other action it deems necessary." According to Corcoran, although there was no opposition to the petition and it did not attend the hearing, the probate court could not grant the petition; rather, the court's discretion was restricted to corrective actions similar to those expressed in subdivision (c).

In *Adam v. Sharp* (1964) 61 Cal.2d 775, 777, the California Supreme Court, in holding a probate court properly disregarded a local rule, stated, "Rules of court are but a means to accomplish the ends of justice, and it is always in the power of the court to suspend its own rules, or to except a particular case from their operation, whenever the purposes of justice require." Thus, "[i]n absence of any showing to the contrary, it will be presumed that the court disregarded its rules for sufficient cause and to subserve the ends of justice, as it had the power to do." (*Johnson v. Sun Realty Co.* (1934) 138 Cal.App. 296, 299; see also Los Angeles Superior Court Local Rule, subd. 4.2 ["[t]he court for

---

[18] Corcoran's counsel stated that she "accessed" the probate notes on July 27, 2018.

31

good cause may waive the application of the Probate Division Rules in an individual case"].)

Here, with Corcoran absent and no objections, the probate court had the discretion to grant the petition, despite Petty's one-day delay in filing her response to the notes. The updated probate notes largely concerned service issues. On July 26 Corcoran raised service objections in a letter to Petty's counsel. However, Corcoran chose not to assert those objections in the probate court through a motion to quash or otherwise. Because it had decided not to participate in the July 30 hearing, Corcoran could not have been prejudiced because there was nothing it would have done differently if Petty timely served its response. Further, the court updated the probate notes on July 25, leaving Petty with one day to timely respond. Petty filed a 64-page response on July 27. Under these circumstances, the probate court was well within its discretion to hear the petition on its merits. See *In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682 ["Generally, where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its judgment of the proper decision for that of the trial judge. The trial court's exercise of discretion will not be disturbed on appeal in the absence of a clear showing of abuse, resulting in injury sufficiently grave as to amount to a manifest miscarriage of justice. . . . The burden is on the complaining party to establish abuse of discretion"].)

### 3. *The Probate Court's Order Does Not Conflict with the District of Columbia Order*

Corcoran's defective motion for reconsideration also argued that the District of Columbia order revised the Pascal agreement, restricting its ability to remove the Pascal collection from the

District of Columbia.  Referring to the Full Faith and Credit Clause of the United States Constitution,[19] Corcoran makes the argument again on appeal.  That argument, even if properly raised, was also meritless.

Corcoran argues that, because the transfer agreement with National Gallery applied to "art works owned or controlled by the Corcoran," it therefore applied to the Pascal collection.  According to Corcoran, "[i]t follows" that the Pascal agreement was "an 'other applicable instrument'" subject to revision to the extent necessary under the District of Columbia order.[20]  Because the side letter supplemented the transfer agreement by adding geographic distribution restrictions for art works, Corcoran maintains that the District of Columbia order "revised the Pascal Agreement to the extent necessary to incorporate" the side letter.  The side letter required the Attorney General's permission or a

---

[19]  "Under the full faith and credit clause of the United States Constitution a valid judgment of a sister state must be enforced by the courts of every other state."  (*Paul v. Miller* (1943) 61 Cal.App.2d 73, 77; Code Civ. Proc., § 1913, subd. (a) ["the effect of a judicial record of a sister state is the same in this state as in the state where it was made"].)  California recognizes a District of Columbia judgment as a sister state judgment. (*Richard A. Viguerire Co. v. Noble* (1980) 101 Cal.App.3d 62, 64.)

[20]  The District of Columbia order provides, "The actions necessary by [Corcoran] to perform and implement the [agreements with National Gallery and George Washington University], according to their terms, are hereby approved and the Corcoran Deed of Trust and any other applicable instrument is deemed revised to the extent necessary to permit [Corcoran] to perform and implement the [agreements with National Gallery and George Washington University] according to their terms."

further cy pres order before Corcoran can distribute art works outside of the District of Columbia. Corcoran concludes, the "full faith and credit clause obligates California to enforce" the District of Columbia order. Petty, on the other hand, argues that the full faith and credit clause is not implicated because the Pascal collection was not subject to the District of Columbia order.

Because there was no conflict between the District of Columbia order and the probate court's judgment, we do not reach Corcoran's argument under the full faith and credit clause. Corcoran's argument is premised on classifying the Pascal agreement as an "other applicable instrument" under the District of Columbia order. As an "other applicable agreement," according to Corcoran, the Pascal agreement was deemed revised to allow Corcoran to consummate the transaction with the National Gallery. Both premises are faulty.

After considering Mr. Corcoran's original intent when establishing Corcoran, the District of Columbia court under the cy pres doctrine "deemed revised" the 1869 deed of trust to allow consummation of the National Gallery and George Washington University transactions. Because District of Columbia court found "it [was] impracticable to carry out the existing Deed of Trust" and its order "effectively dissolve[d] the Corcoran as an independent entity," instruments, such as Corcoran's original deed of trust, required revision. These instruments had governed the manner in which Corcoran operated as an independent nonprofit entity. Transferring Corcoran's assets to other institutions conflicted with Mr. Corcoran's intent expressed in the deed of trust. Similarly, "any other applicable instrument" necessary to have permitted implementation and performance of the National Gallery and George Washington University

34

transactions was also deemed revised.  Missing from Corcoran's argument is why "it follows" that the Pascal agreement was in this category of "any other applicable instrument," akin to Corcoran's 1869 deed of trust.  Corcoran does not explain why it was "necessary" for implementation and performance of its agreements with the National Gallery to have deemed the Pascal agreement revised to "incorporate" the side letter's geographic distribution provisions.  It was not.

To be sure, Corcoran, the National Gallery, and George Washington University performed and implemented their agreements without the need to incorporate new terms into the Pascal agreement.  In other words, without implicating the Pascal agreement, George Washington University assumed ownership and operation of Corcoran's building and Corcoran College, and Corcoran transferred the art works to the National Gallery for accession or distribution.  Without the Tyler trust before it, the District of Columbia court did not render any adjudications regarding the Pascal agreement.  Moreover, during the 20 years it performed the Pascal agreement, Corcoran did not accession the Pascal collection, and the National Gallery declined to accession the Pascal collection.  Accordingly, the National Gallery is holding the Pascal collection "for the benefit of Corcoran" awaiting distribution.

Far from incorporating terms to diminish third parties' rights, the transfer agreement contemplated maintaining "then-existing liabilities, commitments and obligations" for art works to be distributed.  The District of Columbia order also provided that the National Gallery "shall adhere to the restrictions as otherwise applicable to the [art works], as those restrictions have been understood and implemented previously by [Corcoran]."

Moreover, the court in its decision stated that "'any existing donor restrictions that are applicable to the particular assets' will remain in place. . . ."  Consistent with these provisions, after execution of the transfer agreement and the side letter, Corcoran offered to return the Pascal collection to Petty in California. Corcoran has not shown that the District of Columbia order impacted the Pascal agreement or its ability to comply with the probate court's order by returning the Pascal collection to California.[21]

---

[21]    Corcoran has not contested the enforceability of the conditions subsequent in the Pascal agreement requiring, in the event of breach, the return of the Pascal collection and the $1 million gift.  Nor has Corcoran denied it breached the Pascal agreement, entitling the Tyler trust to terminate the Pascal agreement.  Corcoran only argues that it cannot comply with the probate court's judgment because it requires permission to remove the Pascal collection from the District of Columbia.  But, under the side letter, on which Corcoran relies so heavily, it could have designated in the first instance a "non-DC institution [as] the most suitable candidate" for non-accessioned art works such as the Pascal collection.  Thus, Corcoran could have designated the Pascal collection for return to Petty in California and sought the Attorney General's permission to transfer the collection.

**DISPOSITION**

The judgment is affirmed.  Petty shall recover her costs on appeal.


DILLON, J.*


We concur:


SEGAL, Acting P. J.


FEUER, J.

---

\*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.